UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

DAVID T. HARGETT,

                        Plaintiff,

- against -                                              06-cv-7094-CM-KNF
                                                         06-cv-7095-CM-KNF

NEW YORK CITY TRANSIT AUTHORITY,
STANLEY GRILL, DAVID ROSS, and
MAY MCINTOSH,

                        Defendants.

-------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/4/09

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

Introduction

On September 16, 2006, Plaintiff David T. Hargett ("Hargett"), *pro se*,

commenced two related actions in this Court alleging wrongful discharge in violation of

his civil rights (42 U.S.C. § 1981), the Age Discrimination in Employment Act (ADEA)

(29 U.S.C. § 621 *et. seq*.), and New York State Human Rights Law (NYSHRL) § 296, as

well as state law claims of defamation, intentional infliction of emotional distress (IIED),

and breach of contract.  Hargett sued the New York City Transit Authority (NYCTA or

the Authority) and three NYCTA executives—Vice President Stanley Grill, ("Grill"),

Chief Operations Officer David Ross, ("Ross"), and Assistant Chief Operations Officer

May McIntosh, ("McIntosh") (collectively, the "NYCTA Defendants").  He also sued the

1

Metropolitan Transit Authority (MTA) and two MTA employees—Director Ken Neal, ("Neal"), and Commissioner James Harding, Jr., ("Harding") (collectively, the "MTA Defendants"). The cases were consolidated during a conference with the parties on October 5, 2007.

Plaintiff seeks damages in connection with his termination from the NYCTA on June 24, 2004.

The Court assumes the parties' familiarity with its opinion and order dated April 7, 2008. Hargett v. Metro. Transit Auth., 552 F. Supp. 2d 393 (S.D.N.Y. 2008). In that decision the Court dismissed the complaint against the MTA Defendants in its entirety. The Court also dismissed Hargett's claims of defamation, intentional infliction of emotional distress, breach of contract against the NYCTA Defendants, as well as denied his request for punitive damages against NYCTA. Id. The Court denied the NYCTA Defendants' motion to strike paragraphs 18 through 20 in the complaint against them. Id.

The NYCTA Defendants now move for summary judgment on Hargett's remaining claims of wrongful discharge in violation of his civil rights (42 U.S.C. § 1981), the ADEA (29 U.S.C. § 621 *et. seq.*), and NYSHRL § 296. Plaintiff cross-moves for summary judgment in his favor.[1]

---

[1] Hargett did not formally move for summary judgment. He did, however, submit what he termed a "reply," but was actually a sur-reply, to the NYCTA Defendants' motion. Hargett indicated by cover letter that his sur-reply, along with his opposition to the NYCTA Defendants' motion, should be considered in support of his cross-motion for summary judgment. Defendants submitted by letter that their moving papers should be considered in opposition to Hargett's motion for summary judgment. Because Hargett's *pro se* status means the Court must judge his papers by a more lenient standard than those prepared by attorneys, see Haines v. Kerner, 404 U.S. 519, 520, reh'g denied, 405 U.S. 948 (1972), the Court will consider plaintiff as having made a cross-motion for summary judgment.

2

＊

For the reasons stated below, the NYCTA Defendants' motion is granted; and
Hargett's motion is denied.

## *BACKGROUND*[2]

<u>Plaintiff's Employment History at NYCTA</u>

Hargett identifies himself in his moving papers as a "black African American
male," who is "over the age of 40." (Pl. Opp'n at 2, 18.)  He began employment with
NYCTA sometime in mid-September 1998. (Defs. Rule 56.1 Stmt. ¶ 7.)  His hiring was
approved by defendant Grill, Vice President of the Materiel Division.  (Grill Aff. ¶ 8.)

For the duration of his employment, Hargett worked as an Operations Manager in
what is known as at NYCTA as the "Materiel Division."  The Materiel Division solicits
and manages goods and services contracts for NYCTA. (Defs. Rule 56.1 Stmt. ¶ 7.)
During Hargett's tenure at NYCTA, he took on increased responsibilities. (See, e.g., Pl.
Rule 56.1 Stmt. ¶ 29.)  At the time of his termination he managed several different
contracts, and had a number of direct reports—the parties dispute whether it was three or
seven. (See Defs. Rule 56.1 Stmt. ¶ 8; Pl. Opp'n at 3.)  The individuals who reported to
Hargett managed specific contracts, such as those for uniforms and employee safety
shoes, and Hargett oversaw that process.  (Id. ¶ 8.)

Managing contracts requires, *inter alia*, reviewing vendor invoices to ensure that
the goods and services received are within the scope of the contract and are billed at the
contracted price.  (Id. at ¶ 9.)  In addition to overseeing his direct reports, Hargett was
responsible for the preparation of materials necessary to complete contract renewals or

---

[2] Plaintiff failed to submit a statement of facts responding to each numbered paragraph in
the NYCTA's statement of facts as required by Local Rule 56.1(b). Plaintiff did submit a
separate statement of facts. The Court will note where these two documents conflict.

3

extensions such that there would be no interruption of needed goods and services to NYCTA. (McIntosh Aff. ¶ 8.)

Hargett was often assigned projects that were time sensitive. (Id.)

From September 1998 to November 2001, Hargett reported directly to Assistant Chief Operations Officer, Lionel Gaines. (McIntosh Aff. ¶ 7.) Defendant McIntosh, who is black, replaced Gaines as the Assistant Chief Operating Officer in November 2001, and Hargett reported to McIntosh from December 2001 until his termination on June 24, 2004. (Id.) McIntosh, reported to, among others, defendant Ross, Chief Operations Officer, who is white. Ross reported to defendant Grill (whose race is not clear from the record.) (Id. ¶ 5; Ross Aff. ¶ 5.)

During the time that McIntosh oversaw Hargett, problems repeatedly arose over Hargett's failure to complete projects in a timely manner and to adhere to the Materiel Division's chain-of-command structure. (Id. ¶¶ 9-10.) These concerns were reflected in Hargett's yearly "Management Performance Review" (the "MPR")—a document completed for all managers at NYCTA by their supervisors according to the Performance Management section of the NYCTA Management Compensation manual (the "Manual"). (Defs. Mot. Ex. K; McIntosh Aff. ¶ 12.)

On the MPR, managers are rated on a four-point scale from Poor ("P") to Marginal ("M") to Good ("G") to Excellent ("E"). The ratings can also have a plus (+) or minus (-) attached to them. NYCTA managers are given a rating in a number of individual categories (e.g. decision making, interpersonal skills), as well as an overall rating for the year. (Id.; Defs. Rule 56.1 Stmt. ¶ 77.) The MPR has a section for supervisor comments. (Id.)

4

Hargett received an overall rating of "G" in MPRs for the years 1998 to 2003. (Defs. Mot. Ex. K.)  Ratings of Hargett's individual skills ranged from "G-" to "E." Supervisor comments consistently indicated concerns about delays in projects handled by Hargett.  (Id.)

NYCTA mangers who are dissatisfied with their overall rating on the MPR may pursue an internal appeals process.  (Id. at 1-2.)  The first level of review is the manager's immediate supervisor.  If the manger is not satisfied with the outcome of that review, he or she may escalate the matter to the division head, and then to an appeal board consisting of a human resources representative, a manager from a division different from the appealing manager, and an Equal Employment Opportunity representative.  (Id.)  If dissatisfied with the appeal board's findings, the manager can obtain the review of the department head, who renders a final decision.  (Id.)

Hargett disputed his MPR ratings through the internal appeals process for the years 2000, 2001, 2002 and 2003, arguing that his overall ratings should have been "E" instead of "G," and taking issue with specific statements in the comment section.  (Id. at 3-56.)  Hargett's supervisors—both McIntosh and Grill—reviewed plaintiff's submissions and responded with memoranda outlining the decision making process that led to plaintiff's final rating. (Id.)  McIntosh and Grill consistently cited a lack of communication with superiors, a failure to follow NYCTA's chain-of-command structure, and problem meeting deadlines as reasons why Hargett's overall rating was "G" instead of "E." (Id.)

Hargett's overall ratings were not upgraded to "E."  However, after Hargett protested, a sentence reading, "In addition, David's earlier uncooperative demeanor

toward his manager resulted in an antagonistic environment" was deleted from his 2002 MPR, and replaced with "In addition, David has missed meetings scheduled with his immediate supervisor as well as with senior management, and has failed to adequately brief his manager on critical issues including his plans to be away from the office for training or other reasons." (Id. at 51.) Hargett objected to the substituted statement as well, and complained that it was written with "expressed malice." (Id. at 51-52.)

It does not appear from the record that Hargett escalated any of his appeals beyond his division head, defendant Grill. (Defs. Mot. Ex. K.)

Hargett testified at his deposition that he believed the MPR process to be "unfair," but agreed that it was not racially biased. (Defs. Mot. Ex. GG, Hargett Dep. Tr. at 165: 18- 170:13.)

In addition to Hargett's disagreements with management over his MPR ratings, Hargett clashed with McIntosh and upper management on a number of other occasions during his tenure at NYCTA.

In the winter of 2001-2002, defendants McIntosh and Ross questioned the failure of Hargett's unit to prepare the necessary paper work to extend the "shoe/sock" contract. (Defs. Rule 56.1 Stmt. ¶¶ 108-11.) Hargett contended that the fault lay with his former manager Gaines. (Id.)

In April 2002, Ross reprimanded Hargett for his unit's failure to pay the uniform vendor within forty-five days of receiving the invoices—a violation of the contract. (Id. ¶¶ 112-13.)

In August 2002, Hargett sent an e-mail to senior management in which he joked about how hot it was at a vendor's warehouse and said that "the working conditions [at

6

vendor's warehouse] aside from the wages, seem similar to the way things were in the 60s". (Id. ¶¶ 114-17; Ex. M at 1.) Ross asked whether Hargett was trying to suggest that "we are or would be supplied by a vendor using unsafe or unhealthy facilities?" (Id. at 2.) Hargett responded that he never said the working conditions were unsafe or unhealthy. (Id. at 3.)

On October 15, 2002, McIntosh tasked Hargett with preparing a "re-projection of 5 year uniform costs" by October 18, 2002. (Defs. Rule 56.1 Stmt. ¶ 119.) From October until late January 2003, Hargett provided McIntosh with different reasons—new projects coming in, vacations, and technical glitches—for why he could not complete the assignment. (Id. ¶ 122; Ex. O at 5-10.) It is not clear from the record whether or when Hargett finally completed the assignment.

The Safety-Shoe Contract

In the fall of 2003, an audit was performed on the "safety shoe" contract handled by Hargett's unit. (Defs. Rule 56.1 Stmt. ¶ 126; Ex. Q.) The audit concluded, *inter alia*, that certain payments had been made that were not authorized by the contract, and that certain contract documentation was missing. (Id. ¶ 127.) In an October 22, 2003 memorandum, McIntosh reproached Hargett for the mistake, stating that it "reflects a serious flaw in managing contracts," and that the audit had been made more difficult due to Hargett's "resistance" to the auditor's requests for information. (Defs. Mot. Ex. Q at 10.)

Hargett did not dispute the findings of the audit, but took issue with McIntosh's characterization of his error in a responsive memorandum. He pointed out that the mistaken charge of $2,317 was comparatively minimal in the context of a $6,650,000

7

contract. (Id. at 11-12.) Hargett also objected to a "pattern of micro-management," and suggested that the real reason for McIntosh's memorandum concerning the audit was Hargett's involvement in the Conference of Minority Transportation Officials (COMTO). (Id. at 13.)

### Hargett's Involvement in COMTO and the 2003 Conference of Minority Contractors

COMTO is a voluntary organization which advocates for increased minority representation in the transportation field. (Defs. Rule 56.1 Stmt. ¶ 96.) COMTO is not sponsored by NYCTA. (Id.) Hargett was a Vice President of the New York chapter of COMTO.

In the fall of 2003, Hargett's responsibilities at NYCTA included assisting in the planning of a conference of minority contractors. (Defs. Rule 56.1 Stmt. ¶ 218.) The purpose of the conference was to provide the contractors with information about bidding on NYCTA contracts. (Id.) On or before September 11, 2003, Ross—after reviewing draft materials listing COMTO as a co-sponsor of the event—advised Hargett that it was a NYCTA conference, and while COMTO could be mentioned, it should not appear that COMTO sponsored the conference. (Id. ¶ 219.) In a September 11, 2003 e-mail to Ross, Hargett replied "COMTO is an equal party to this training." At the conference, Hargett distributed materials listing COMTO above NYCTA as the conference's primary sponsor. (Id. at 220; Defs. Mot. Ex. DD at 2.) Ross documented Hargett's failure to follow his instructions in a memorandum, dated September 22, 2003. (Defs. Mot. Ex. DD at 1-2.)

Hargett responded to Ross's September 22nd memo with his own memorandum, dated October 27, 2003. (Id. at 4-6.) Hargett claimed that Ross's memorandum was "in

8

retaliation to my questioning and asking you to discuss further any comments and changes to remove the Conference of Transportation Officials (COMTO) from the Minority Business Initiative Training Session." (Id. at 4.)  Hargett argued that he had complied with Ross's directives about the training materials, but that Ross never told him to remove COMTO as a sponsor.  (Id.)  He also alleged that Ross resented his involvement in COMTO.  (Id.)

<u>The 2004 Review of the Forklift Maintenance Contract</u>

NYCTA conducts annual reviews of all contracts in the Materiel Division. (McIntosh Aff. ¶ 13.)  In 2004, McIntosh handled these reviews, and scheduled meetings with the individual responsible for the contract, and that individual's supervisor.  (Id.) On March 2, 2004, McIntosh scheduled a meeting to review the "forklift maintenance" contract with Jocelyn Powell, who was assigned the contract, and Hargett, her supervisor. (Id.)  Hargett did not appear at the meeting.  (Id.)  During the meeting between McIntosh and Powell, it was discovered that Powell had approved of, and Hargett had authorized, the payment of invoices without comparing the invoice price with the contract's book price.  (Id.)  Powell claimed that Hargett had never provided Powell with a price book, nor had he trained her to use one.  (Id.)  McIntosh scheduled several meeting to discuss the forklift contract, and payment procedures with Hargett and Powell. (Id. ¶ 14.) Hargett failed to attend, but he did send another member of his team to the meetings. (Id.)  As a result of the mistakes already uncovered, McIntosh directed a partial audit of invoices paid under the forklift contract.  (Id. ¶ 15.)

### Hargett's Problems with Jocelyn Powell

Hargett claimed in his complaint that NYCTA assigned him troublesome or underperforming employees. (Compl. ¶ 10.) Powell was one such employee. At McIntosh's deposition, she testified that Powell had a history of having problems with her managers, and that she had been given warnings that she was on her last chance when she transferred to Hargett's unit. (Pl. Rule. 56.1 Stmt. ¶ 12.)

In the spring of 2004—around the same time McIntosh discovered the problem with the forklift contract—there is documentation of Powell and Hargett having problems at work. Hargett and Powell fought over: Powell's decision to bring her daughter to work while Powell's home was being fumigated; Hargett's insistence that Powell take an early lunch hour over Powell's protests; and Powell's accusation that Hargett had taken her eyeglasses. (Defs. Rule 56.1 Stmt. ¶¶ 153-57.)

On April 9, 2004, Powell sent Hargett the following e-mail,

David, I don't know why an attitude is developing from you to me and has been over the past few weeks. It has bothered me greatly, especially after not hearing a response from you of my e-mail to you on March 24, 2004 which was after our meeting with May [McIntosh]. Actually, that is when the change started. Everything that may have really been an issue with you but you never spoke upon is now an issue. However, I don't think the issues are issues but now you want to make them one because you are angry. Like, I said before in my e-mail, I'm here to work and to obtain the most out of my contract. If I asked questions that perhaps upset you at the meeting, nothing was done intentionally to cause problems for myself or you.   Please don't make this a personal issue. Personality conflicts are not good in our professional field. Once again, I do apologize for bringing my daughter to work with me on Wednesday, April 7, 2004. Unfortunately, our house was being fumigated and I could not leave her home in those fumes. You know I have never abused that privilege, but however, I will definitely notify or ask you prior. I rather not let her hear that type of situation again.

(Defs. Mot. Ex. T at 2.)

On May 26, 2004, Powell sent Hargett another e-mail in which she wrote "Please no more of those in appropriate [sic] jokes and pictures from you. Lets [sic] keep it strickly [sic] business." (Id. at 10.) A few minutes later, Powell sent another e-mail, stating, "The vendor also request those types of jokes do not be forward to there [sic] job locations." (Id. at 12.) Powell copied McIntosh on both of the May 26th e-mails. The action McIntosh took in response to these e-mails will be discussed in the next section.

In Powell's performance review, also dated May 26, 2004, Hargett characterized Powell's handling of the forklift contract as a "critical and fundamental failure." (Id. at 15.) Powell attached a hand-written note to the bottom of her review stating that

> My failure to review the monthly invoices against the price book was a result of never receiving the book until 1½ years after obtaining a contract. After receiving the pricebook on March 2, 2004, because all of the 2003 invoices were to be reviewed by upper management in preparation for an audit, management requested for me to falsely check off on the invoices that had not been previously reviewed and was well aware of that. I would not commit such crime to save another self. . . .

Id. In a May 28 e-mail to Hargett, with McIntosh copied, Powell asked that upper management look at her handwritten comment. (Id. at 17-18.) In that e-mail, Powell stated, "I recall the day of our meeting when you stated that certain things were said regarding the contract (pricebook) came to light and that it was going to effect [sic] my evaluation. I didn't take that threat seriously." (Id.) Hargett responded, "Senior management does not sign off on your performance review." (Id. at 19.)

In a June 4, 2004 e-mail, Hargett reprimanded Powell for her use of the telephone during business hours. (Id. at 22.) Powell responded that she found his behavior "abusive," and that she believed he was "out to damage [her] job." (Id.) Four days later,

on June 8th, Hargett censured Powell about her failure to adhere to her specified lunch hour, warning her that she could subject to "disciplinary action" if she continued to leave for lunch later than her specified time. (Id. at 23.)  The next day, June 9, Hargett wrote a memorandum to the file, copying McIntosh, concerning what he termed "threats, intimidation and inappropriate remarks" by Powell. (Id. at 24.)  Hargett stated, "From Monday, May 3, 2004 until present, Jocelyn has been threatening me verbally by saying that she is going to write to senior management, compile inappropriate emails and by contacting vendors in an attempt to get me fired," and requested the Powell be "removed from the unit effective immediately." (Id.)

On or about June 17, 2004, Powell was transferred from Hargett's unit into a unit run by Lionel Gaines. (Defs. Rule 56.1 Stmt. ¶ 171.)  That same day, Hargett forwarded Gaines, with Powell copied, several prior e-mails in which he had complained to Powell about leaving for lunch after her scheduled lunch hour, stated that he wanted to "document and inform Jocelyn of her repeated disregard for not taking her leave time for lunch as scheduled and instructed." (Ex. T at 27-29) (emphasis in original).  Gaines replied to Hargett, "David, Although I appreciate your efforts to inform me of pass [sic] performance issues, Jocie should not be copied on such matters." (Id. at 27.)

On August 19, 2004, Powell resigned from the Transit Authority, effective September 24, 2004, citing her desire to "explore other employment opportunities." (Defs. Mot. Ex. Z.)  In her letter of resignation, Powell also stated, "I would also like to give a special thanks to my ACOO, Ms. May McIntosh for all her help and believing in me.  My supervisor, Lionel Gaines, taught me so much in such a short time under his management." (Id.)  Powell did not mention Hargett in the letter.

12

.        *

## Inappropriate E-Mails on Hargett's Computer

After being copied on Powell's e-mails to Hargett about sending inappropriate messages to her and to outside vendors, Powell showed McIntosh print-outs of e-mails she had received from Hargett. (McIntosh Aff. ¶ 19.) McIntosh directed Powell to provide print outs of the offending e-mails to Grill. (Id.) McIntosh also informed Ross of Powell's complaint about inappropriate e-mails from Hargett. (Ross Aff. ¶ 7.) Ross and Grill discussed the issue; they decided Ross should be given access to Hargett's computer files. (Id. ¶ 8.) Ross accessed Hargett's files from Ross's own computer and found "scores of non-work related emails with pictures or video clips, many of a sexual nature" sent from Hargett's NYCTA e-mail account. (Id. ) Copies of those e-mails and their attachments are annexed to NYCTA's motion as exhibit X and exhibit W.

The e-mails found on Hargett's computer appear to have been sent by Hargett to other NYCTA employees and to individuals outside of NYCTA. The dates on the e-mails range from February 2003 to March 2004. The content in some of the e-mails and the attachments is sexually or racially charged. For example, one e-mail attachment shows what appears to be a naked man doing a "cannonball" jump into a Jacuzzi where a woman is submerged in bubbles up to her bare shoulders. (Ex. X at 936.) Other attachments show celebrities' heads transposed onto obese, semi-nude bodies. (Id. at 941.) On May 7, 2004, Hargett sent an e-mail "joke" called "Black Man, Gotta Love Him," in which he described a black man diagnosed with cancer telling friends at a bar that he had AIDS so that none of them would sleep with his wife once he was dead. (Id. at 962.) In a May 18, 2004 e-mail with the subject "perfect excuse," Hargett sent a fictitious exchange between an employee and a boss in which the employee tells the boss

13

he cannot come into work because he has "Anal Glaucoma," and explains that this means
that he "just can't see [his] ass coming in to work today." (Id. at 968.)

At Ross's request, Robert Mesnard ("Mesnard"), the Director of Labor Relations
for the Material Division, investigated the inappropriate e-mails. (Mesnard Aff. ¶¶ 1-3.)
Mesnard also found several e-mails of a similar ilk as the ones described above sent from
Hargett's account. (Id. at ¶ 4.) For example, on May 6, 2003, Hargett sent an e-mail with
the subject "Diets that Work" to Powell, and two other employees in the Materiel
Divison, Germaine Harrigan ("Harrigan") and Juanita Newberry ("Newberry"). The e-
mail contained an attachment called "Does My Butt Look Big," which showed a picture
of an obese woman wearing translucent black mesh lingerie. (Ex. U at 2.) An August
14, 2003 e-mail with the subject "Summer BBQ," sent to Powell and Newberry,
contained images of a passed out woman wearing only underwear surrounded by beer
bottles and cans; a passed out woman with a dark stain around her crotch area; and a
passed out man with a beer can and cigarettes balanced on his head. (Id. at 3-6.) E-mails
from February 2004 have attachments with images appearing to spoof Janet Jackson's
"wardrobe malfunction" at the 2004 Superbowl. (Id. at 7-11.)

Mesnard interviewed three women Hargett supervised—Powell, Harrigan and
Newbury—and showed them some of the e-mails described above. (Mesnard Aff. ¶ 5.)
In July and August 2004, Mesnard obtained a handwritten, signed statement from each
woman confirming that they had received that they had received at least some of the e-
mails from Hargett. (Id.; Ex. Y.) In Powell's statement, dated July 28, 2004, she wrote,
*inter alia*, that "I truly do believe that these e-mails were sent to me as friendly jokes and
not the intent to hurt any body, we both laugh together when something was funny.

14

David Hargett has always played jokes and made jokes and I became a victim of him."
(Pl. Mot. Ex. Y at 738.)

### Hargett's Previous Wrongful Termination Lawsuits

According to Ross, during his review of Hargett's computer hard drive, he also found a document that referenced a lawsuit in which Hargett had sued his former employer National Westminster Bank ("Nat West") for wrongful termination. (Ross Aff. ¶ 9.) This document is not in the record. Ross contacted the NYCTA Law Department, and its research revealed that Hargett had in fact instituted two lawsuits against two former employers—Nat West and United Jersey Bank—alleging wrongful termination. (Id. ¶ 10.)

In 1993, Hargett filed suit in this District against Nat West, where he worked as "Vice President, Area Business Director" from November 13, 1991 to April 6, 1992, and two Nat West employees, alleging that his termination was racially motivated, violating 42 U.S.C. § 1981 as well as state and local laws. (Ex. E, hereinafter "Nat West Compl.") Nat West's stated reason for firing Hargett was that Hargett permitted a stripper to perform during a monthly branch manager's meeting over which Hargett presided, apparently in an effort to celebrate another employee's birthday. See Hargett v. Nat'l Westminster Bank, 78 F.3d 836, 838 (2d Cir. 1996). The stripper's performance took place in a Nat West conference room during business hours. Id. Hargett claimed that his firing was racially discriminatory because white employees who had engaged in similar conduct were not terminated.

Following a trial, a jury rendered a verdict in favor of Nat West. Id. On March 19, 1996, the Second Circuit affirmed the district court's dismissal of the complaint

following the jury verdict. Id. Plaintiff apparently filed a petition for Writ of Certiorari to the Supreme Court; the petition was denied. (Pls. Mot. Ex. L.).

In 1997, Hargett instituted a second lawsuit in the District of New Jersey—this time as a *pro se* litigant. Hargett sued his former employer, Summit Bancorp (formerly known as United Jersey Bank, "Summit"), where Hargett was employed from May 1995 until April 1996, and two individual employees, again alleging racially motivated termination in violation of 42 U.S.C. § 1981. (Defs. Mot. Ex. G.) Summit defended on the ground that Hargett had been fired, not because of his race, but because of Hargett's repeated failure to adhere to Summit rules and procedures. For instance, on one occasion, Hargett withdrew cash from a Summit client's account without supporting documentation and personally transported the cash from New Jersey to New York using a duffel bag and no security. Hargett did not deny that he took the actions Summit alleged, but claimed that such actions fell within his managerial discretion. (Id.) In an unpublished opinion, dated January 1, 2007, Judge Katharine Hayden granted summary judgment in favor of Summit. By *per curiam* opinion, the Third Circuit affirmed Judge Hayden's decision on December 21, 2001. (Id.); Hargett v. Summit Bancorp, 281 F.3d 221 (3rd Cir. 2001).

## Disciplinary Charges Brought Against Hargett for E-mails and for Falsification of his Employment Application

After finding out about Hargett's wrongful termination lawsuits, Ross reviewed Hargett's NYCTA personnel file, which contained documents submitted by Hargett during his hiring at NYCTA in 1998. (Ross Aff. ¶ 11.) In a document titled the "Pre-Employment Application" questionnaire, signed by Hargett and dated August 11, 1998, question ten asked, "Were you ever dismissed from a position?" Hargett checked the box

16

next to "No." (Defs. Mot. Ex. H at 19-20.) Question fourteen asks Hargett to "give full details, including dates" if certain questions, including question ten, were checked "Yes." In response to question fourteen, Hargett wrote "N/A," presumably meaning "not applicable." (Id.) Section seventeen of the questionnaire asked for Hargett's employment record for the past ten years, and the reason for leaving each employer. Hargett listed Nat West and Summit (f/k/a United Jersey Bank), and provided that his reason for leaving each employer was a "Bank Merger." Hargett also represented that he had been employed at Summit from May 1995 to May 1997, even though he was fired in April 1996, and that he was employed at NatWest from November 1991 through March 1993, even though he was fired in April 1992. (Id.)

Hargett signed the August 11, 1998 Pre-Employment Application beneath a clause reading,

> I declare, under penalties of the penal law, that I have completed both sides of this Pre-Employment Application and that the statements contained therein are to the best of my knowledge and belief true and correct and that I have not knowingly and willingly made a false statement or given information which I know to be false in connection therewith.

(Defs. Mot. Ex. H at 21.)

Attached to the Pre-Employment Application in the NYCTA personnel file was a fax coversheet, also dated August 11, 1998. The coversheet reflects that Hargett faxed the questionnaire to J. Jay Bar-David, a NYCTA Human Resources representative. At the bottom of the fax cover sheet there is a handwritten note reading, "P.S. disregard previous fax. #9 was checked incorrectly." (Id. at 19.) Question nine asks, "Were you ever removed or disqualified from public employment?" In the Pre-Employment

17

Application in the file, which is attached to the fax cover sheet, this question is checked "No." (Id. at 20.)

Hargett's personnel file also contained a second Pre-Employment Application, dated September 21, 1998, in which he gave the same answers he gave in the August 11, 1998 document. (Defs. Mot. Ex. I at 1-5.)   The file also contained an over twenty page City of New York "Comprehensive Personnel Document" ("CPD"), also dated September 21, 1998, in which Hargett responded "no" to the questions:

> 15. Were you ever disciplined (i.e. suspended, demoted, reprimanded, fined, fired terminated, discharged) in any position, by either a public or private employer?
>
> 16. Did you ever resign from a job while a disciplinary action was pending against you?
>
> 17. Have you ever resigned from a job to avoid termination or disciplinary action?

(Defs. Mot. Ex. I at 10-33.) He also wrote that he left NatWest because of "company merger, position down graded," and that he left Summit because "company merger, position eliminated." (Id. at 16, 18.) At the end of the CPD, Hargett signed an affirmation, which included the following: "I realize that a false statement or intentional omission of any material fact may cause me to be disqualified, even following appointment or licensure, and may lead to prosecution. . . . I have personally completed this application, and everything I have written is, to the best of my knowledge and belief, true and complete." (Id. at 29.)

Ross concluded based on this information that Hargett had provided false information on during his hiring in 1998 when he stated that he had never been terminated, and that he left NatWest and Summit because of a "bank merger." (Ross. Aff. ¶ 9-10.)

According to the NYCTA policy Manual, falsification of records by a manager can lead to "dismissal and/or demotion in the first instance." (Defs. Mot. Ex. BB at 5.)

On June 23, 2004, in accordance with the NYCTA managerial disciplinary policy, McIntosh, with Grill's approval (Pl. Mot. Ex. 1, Grill Dep. Tr. at 24:24-25:2), served Hargett with disciplinary charges. (Defs. Rule. 56.1 Stmt. ¶ 189; Ex. BB at 1-3.) Hargett was charged with falsifying answers on his pre-employment papers, and sending inappropriate e-mails to NYCTA employees under his supervision. (Id.) McIntosh proposed dismissal as the penalty for Hargett's actions. (Id.) Hargett was suspended without pay or benefits immediately. Pursuant to NYCTA policy Hargett had two weeks to appeal the charges in writing, and request an informal hearing, or the recommended penalty would be automatically implemented. (Id.) Hargett acknowledged by signature the charges against him. (Id.)

Hargett's Appeal of the Disciplinary Charges

NYCTA has an internal procedure whereby a manager can appeal the charges instituted against him first to a "Step I" officer who reviews the manager's appeal, review any pertinent documents, and conduct interviews of any relevant parties. (See Defs. Mot. Ex. BB at 7.) The Step I officer issues a written decision on the appeal. (Id.) This decision can be appealed to a "Step II" officer with a written statement explaining why the charges should not be upheld or the penalty should not be imposed. (Id.) The Step II officer reviews the Step I officer's decision and the manager's appeal and issue a written decision. (Id.) That decision cannot be further appealed within NYCTA. (Id.)

Hargett instituted such an appeal, submitting numerous appeal memoranda and letters to various NYCTA entities and employees. For ease of reading, I will discuss

19

Hargett's defenses to the two charges in turn.  These defenses and arguments are the same ones Hargett now uses to oppose defendants' motion for summary judgment, and in support of his own motion for summary judgment.

### Hargett's Defense to the Charge of Falsification of Pre-Employment Application Documents

In his initial appeal statement of July 2, 2004, Hargett claimed that he had given correct answers on his application in 1998, and "NYC Transit preformed [sic] a background check at the time of my employment and had no questions regarding the information thereof." (Id. at 14.)  Hargett also stated that "NYC Transit has no right to subjectively and routinely perform background and credit checks without my permission. This is clearly an invasion of privacy and disparate treatment." (Id.)

Hargett provided letters from four references he gave in connection with his NYCTA employment application, attesting to the fact that they were contacted by NYCTA in 1998. (Pls. Mot. Exs. O, P, Q, R & S.)  None of these references, however, appears to be from anyone employed at NatWest or Summit, or had reason to know about Hargett's work history at those employers.  One reference, Daryll Bowen, who is identified by Hargett as an employee of a company called "The Concepts Group," stated that he recalled being asked about why Hargett left NatWest and Summit (Pls. Mot. Ex. Q), but there is no indication about what Bowen said in response (Id. Ex. N.)

In letters to the NYCTA law department, and Neil Krakauer, the NYCTA "Step I" hearing officer, dated July 19 and July 20, respectively, Hargett claimed that on August 11, 1998, he had provided Bar-David from NYCTA Human Resources "a revised pre-employment application indicating that questions # 9 & # 10 were inadvertently checked incorrectly." (See, e.g., Id. at 35.)  Hargett attached to these letters a copy of an August

11, 1998 Pre-Employment Application, identical to the one Ross found in his personnel file, (Defs. Mot. Ex. H at 19), except for changes to the fax cover sheet, and to question ten. On the document presented by Hargett during his appeal, the handwritten note at the bottom of the fax cover sheet reading, "P.S. disregard previous fax. #9 was checked incorrectly" is crossed out, and an additional note has been added, which reads, "Pls use this corrected application. #9 & #10 were checked incorrectly. Pls. call to confirm." (Defs. Mot. Ex BB at 41.) In the Pre-Employment Application itself, in response to question ten ("were you ever dismissed from a position?") the "Yes" box has an X in it, and there is a stray mark right next to the "No" box. (Id. at 43.) Question 14 on that application, which asks "If you answered yes to questions 9, 10, 11, 12, or 13, give full details including dates" still has "N/A" written in response, (id.), and "Bank Merger" is also given as the reason Hargett left NatWest and Summit. (Id. at 42.)

Hargett was asked at his deposition whether he had in his possession the original—as opposed to a copy—of the fax cover sheet and Pre-Employment Application he proffered in his letters. Hargett testified at that he did not know. (Defs. Mot. Ex. GG at 122:3-5.)

Barbara Jansen, Senior Director, Employment Services Support Unit of the Human Resources Division at NYCTA, submitted by affidavit that she is responsible for maintaining "hiring package" documents—i.e. the questionnaires and forms prospective employees complete during their hiring at NYCTA. (Jansen Aff. ¶ 3.) Jansen attested that her office provided Hargett with the hiring package in 1998 in the regular course of business, and that after Hargett completed the forms and returned them to NYCTA, they were microfilmed and kept in his personnel file. (Id. ¶ 4-5.) After reviewing Hargett's

personnel file, Jansen confirmed that the August 11, 1998, Pre-Employment Application
provided by Hargett to the NYCTA law department on July 19, 2004, (at Defs. Mot. Ex.
BB 41 and 43) does not match the August 11, 1998, Pre-Employment Application in
Hargett's NYCTA personnel file. (Id. ¶8-10.)

Hargett acknowledged during his deposition that the fax cover sheet and Pre-
Employment Application in which he changed his answer to question ten from "no" to
"yes" were not contained in his NYCTA's personnel file. (Defs. Mot. Ex. GG, Hargett
Dep. Tr. at 20:20-25.)

In an August 4, 2004 letter to Neil Krakauer, the NYCTA employee hearing
Hargett's appeal, Hargett stated, "Who is to say what was discussed and the exceptions
made during pre-employment discussions 5 ½ years ago.  I was completely upfront with
NYC Transit about my ongoing civil lawsuits and I was told that this was not a problem."
(Id. at 82.)

Hargett also argued that in the process of filing out his pre-employment
applications in August 1998, he told Bar-David about the pending lawsuits he had against
two previous employers, and asked Bar-David how he should fill out question ten on his
Pre-Employment Application. (Defs. Mot. Ex. FF, Hargett Dep. Tr. at 56:16-57:10.)
According to Hargett, "[Bar-David] told me since the litigation was still pending and that
there is really no outcome to the lawsuit, so to answer and he said specifically number 10
'Were you ever dismissed from a position' and said to me to white out where I initially
marked yes.  He said to mark no because the litigation was still pending." (Id. at 57:2-
10.)  Hargett also testified that it was Bar-David's idea for Hargett to put "bank merger"
as the reason he left Summit and NatWest. (Id. at 60:15-20.)  Hargett testified that even

thought he knew this information to be false he "relied on [Bar-David's] expertise in filing out these forms." (Id. at 60:18-19.)

In support of his position that at the time he was hired he believed his lawsuits were still pending, Hargett provided a letter—both during appeal and in support of his motion papers—from the attorney who represented him in his action against NatWest, stating, "It is our understanding that Mr. Hargett first became aware of the decision of the Supreme Court [denying certiorari] in 1999." (Pls. Mot. Ex. L.)

Hargett's Defense to the Charge of Sending Inappropriate Emails

In Hargett's initial July 2, 2004, appeal memorandum, he stated, "I have no knowledge of the contents of th[ese] e-mail[s] or where [they] came from," and questioned, in each instance, why the offending e-mail was not reported at the time it was sent. (Id. at 14-15.) He suggested that Powell reported these e-mails only after Hargett documented her poor performance. (Id.) Hargett asserted, "If the documentation of Jocelyn [Powell] for poor performance had not occurred, I would not have been suspended or entrapped." (Id.) Hargett also claimed in his July 2nd letter that NYCTA's e-mail system is susceptible to tampering. (Defs. Mot. Ex. BB at 17.)

By letter dated July 19th, Hargett also wrote to a representative of the NYCTA Law Department, and reiterated his argument that he should not be held accountable for the e-mails because NYCTA computers were susceptible to hacking. He theorized about how other employees could have surreptiously obtained his password and about viruses that could have gotten into NYCTA computers. (Id. at 37.) Hargett also argued, *inter alia*, that, "There are no disclosure statements any where informing employees that they will be terminated for any violation of the NYC Transit's Email Policy;" "NYC Transit

23

does not allow employees an opportunity to review everything on their hard drive . . . in order to delete emails that are not theirs;" and "There are no disclosure statements informing employees that nothing can be completely deleted from their hard drive. This can be construed as an employer engaging in electronic monitoring of employees without getting prior written consent." (Id. at 36-37.) Hargett again stated that he had "no knowledge" of the e-mails he allegedly sent to Powell and others. (Id. at 37.)

During his deposition, Hargett testified that he did not send any of the e-mails shown to Powell, Harrigan and Newbury, and that he suspected that someone—namely Jocelyn Powell—had hacked into his computer and sent the e-mails from his account in an attempt to get him fired. (Ex. GG, Hargett Dep. Tr. at 44:14-52:16.)

At various depositions in this case, Hargett showed witnesses what appeared to be print-outs of e-mails with inappropriate pictures attached; the e-mails purported to be sent by Gaines, and one of Hargett's former subordinates, Harrigan. When Hargett was deposed, however, he admitted that he had created the documents himself.

> Q: Plaintiff's 13, you showed this exhibit to Mr. Gaines, it purports to be an email from Mr. Gaines dated May 9, 2004 to Sandra Warner, David Hargett, Sheila Scott, Kevin Belin, and Wendy Farrow. Do you know who the recipients are?
>
> A: I do.
> ....
>
> Q: You created this document didn't you?
>
> A: Yes, I did.
>
> Q: How did you do that? Did you take the top line and then Xerox the image of the woman on the picnic table?
>
> A: Yes.
>
> Q: So you copied the top line and took the image and you Xeroxed it onto the sheet?

24

A: Yes.

Q: Where did you get the image of the woman from?

A: From the emails that purportedly I sent to Jocelyn Powell.
....

Q: Plaintiff's 17 purports to be an email from Jermaine Harrigan, dated May 12, 2004, to Sandra Warner, David Hargett, Sheila Scott and Kevin Belin. And there are a number of images and cartoons attached to this – you created this email, correct?

A: Yes.

Q: And this is like the one from Gaines, right?

A: Yes.

Q: And Jermaine [Harrigan] did not send this?

A: Yes.

Q: And you created this by copying the two front lines above and then Xeroxing the image along with the email information?

A: Yes.

Q: Where did you get the image of the Heineken bottle?

A: I don't recall.

(Def.'s Mot. Ex. HH, at 19:22-20:9; 21:8-19; 27:9-28:7.)  It appears that Hargett fabricated the documents in an effort to demonstrate that e-mail tampering could occur on the NYCTA system. After showing one of the doctored e-mails to Gaines during Gaines' deposition, Hargett stated, "For the record, Mr. Gaines didn't send these. This is not his manner. I'm just saying that it's possible that someone could have made a complaint against another employee, either cut and paste some documents or got into another person's computer and sent some inappropriate E-mail." (Pls. Mot. Ex. 7, Gaines Dep.

25

Tr. at 60:14-22.)  Many of the photographs used by Hargett while conducting depositions were different from the ones Powell provided to Grill.  (Defs. Mot. Ex. U.)

On August 14, 2004, Hargett wrote to Grill and suggested an "alternate solution" to the disciplinary action taken by NYCTA.  (Defs. Mot. Ex. BB at 95.)  Hargett also claimed that, in May of 2004, he switched out the hard drive in his PC and replaced it with the hard drive of another NYCTA employee, and therefore the files retrieved might not be his own.  (see, e.g., Defs. Mot. Ex. BB at 171.)

On August 14, 2004, Hargett wrote to Grill and suggested an "alternate solution" to the disciplinary action taken by NYCTA.  (Defs. Mot. Ex. BB at 95.)  Hargett proposed that instead of being fired, his punishment could be that he would get to work on developing a program to train NYCTA employees about inappropriate e-mails.  (Id.)  Hargett stated, *inter alia*, "Without clear examples and training, what's considered inappropriate may infringe on another person's Constitutional Rights," and noted that "Pornography is not the same thing as obscenity, although people often use the terms interchangeably." (Id. at 96.)  Hargett asked Grill to allow the disciplinary charge to serve as his "final warning," and to let him work to "develop this cutting edge training and help Materiel reap the rewards of better overall management . . ." (Id. at 97.)

Hargett's Charge of Discrimination and Disparate Treatment

In Hargett's appeal memos, and in his summary judgment papers, he claims he is the victim of disparate treatment because white NYCTA employees who committed infractions of NYCTA policies were not punished as severely as he was.  (See BB at 16.)

Hargett points out that following a reported altercation with Hargett, NYCTA employee Peter Gillespie, who is white, was never "discipline[d] nor was he subject to any post-employment background and credit checks." (Id.)

26

On October 9, 2001, Gillespie, who was at that time the Assistant Chief Procurement Officer (a position senior to plaintiff's) got into an altercation after Hargett asked Gillespie if he was attending a training session—a question Gillespie evidently found insulting because of his position of seniority. (Pls. Mot. Ex. AA.) Hargett, characterizing the incident as an "assault," reported that Gillespie pointed his finger in Hargett's face and repeatedly cursed at him. (Id.) The next day Gillespie apologized to Hargett for his actions. (Id.) In his memorandum to the file documenting the incident, Hargett wrote that "I will strongly recommend that ACPO Peter Gillespie receive Anger Management training, Dealing with Diversity training, Interpersonal Skills training and receive counseling for stress management." (Id.) Hargett also stated that he intended to keep his memorandum confidential, explaining, "I strongly believe that should the contents of this letter become public knowledge with formal charges pressed against ACPO Peter Gillespie, I would ultimately be labeled a 'trouble maker' which would derail my career." (Id.)

Grill testified at his deposition that, following the incident, Gillespie was reprimanded by a memorandum to the file. (Pl. Rule 56.1 Stmt. ¶ 35; Pl. Mot. Ex. 1, Grill Dep. at 63:16-25.)

Hargett also argued that similar discipline was not applied to white NYCTA employees who were "accused by two (2) major bus manufactures [sic]" of ethics violations after impermissibly accepting dinners and things of value from outside vendors. (Defs. Mot. Ex. BB at 37-38.)

27

Hargett also points out employees who were previously found to have sent pornographic e-mails during an investigation in 2000 were not dismissed or suspended without pay or benefits. (Id.)

In his opposition papers, Hargett claims that Ross, at some unspecified time stated that "plaintiff wasn't one of his boys" for refusing to fire a subordinate, which Hargett found racially discriminatory. (Pl. Opp'n at 4.) Hargett cites no evidence in the record to support this statement.

Hargett's Disciplinary Charges are Upheld and Hargett's Dismissal is Implemented

### *The Step I Decision*

On September 23, 2004, Krakauer, the Step I officer, issued a formal, written decision on Hargett's appeal. (Id. at 98-109.) In his twelve-page decision, Krakauer stated that he reviewed all of Hargett's submissions, and conducted interviews with several NYCTA employees including, Hargett himself, Bar-David, and representatives from NYCTA Technology and Information Services ("TIS"). (Id.) Krakauer's addressed Hargett's arguments and defenses in turn, and explained his reasons why he believed Hargett's argument lacked merit or was not credible in light of the evidence. For example, in response to Hargett's suggestion that the computer files found on his PC were not his because Hargett had switched his hard drive for that of another employee, Krakauer wrote that he checked with TIS and confirmed that the information was retrieved from the hard drive with Hargett's personal "asset tag." (Id. at 105.)

Krakauer noted that Bar-David had no recollection in 2004 of receiving Hargett's revised fax, or discussing Hargett's terminations, and subsequent lawsuits with NatWest and Summit in 1998. (Id. at 99-100.)

28

Krakauer also explained that he did not find credible Hargett's claim that he had sent a revised fax on August 11, 1998, changing his answer on question ten to "yes," in light of the documents dated September 21,1998 (over a month later) in which Hargett had represented that he had never been fired.  Krakauer also noted the incongruity of Hargett's argument that Bar-David told him he need not disclose his prior terminations, and his claim that he provided NYCTA a corrected Pre-Employment (which, conveniently, is nowhere in NYCTA's files.) (Id. at 101.)

Krakauer concluded that Hargett had "engaged in serious managerial misconduct, which warrants the penalty of dismissal from service."  (Id. at 109.)

Krakauer noted that "had the charges simply related to your transmittal of offensive e-mail, I might have been inclined to find a lesser than dismissal punishment to be appropriate." (Id. at 107.)

### Step II Appeal

By letter dated October 8, 2004, Hargett appealed Krakauer's decision to the Step II officer, NYCTA's Vice President of Labor, Ralph Agritelly.  (Id. at 110-57.)  Agritelly appointed David Hyland, a Senior Director in Labor Relations, to be the Step II officer. (Id. at 165.)  In his appeal of Krakauer's Step I decision, Hargett submitted, in addition to his October 8, 2004 letter, two additional letters dated October 13 and November 11, each with attachments.

In his submissions, Hargett made essentially the same assertions he had made to Krakauer.  (See, e.g., id. at 168-172.) (Id. at 181.)  Hargett also again argued that he was the victim of discrimination, closing one letter by stating "Unfortunately, with all the post

911 precautions, the war in Iraq, the rise of HIV, etc. the most devastating cancer of our times is that of ***discrimination***." (Id. at 164) (emphasis in original).

### Step II Decision

On November 18, 2004, Hyland issued a written decision sustaining the decision to fire Hargett. In that decision, Hyland stated that he had reviewed the Step I decision, all of Hargett's submissions, including the submissions made during his Step I appeal. (Id. at 185.) As to the charge of sending inappropriate e-mails, Hyland rejected the notion that it was possible that "on at least five occasions, over the course of months, some unknown individual used his log-in identification in order to pose as [Hargett]" and send inappropriate e-mails from his account. (Id. at 186.) Hyland also pointed out that Hargett was in fact on notice that misuse of the NYCTA computer system could lead to discipline, and pointed out an August 2000 letter from NYCTA's President to all employees, which stated, "The transmission of obscene, pornographic or inappropriate images is strictly prohibited . . . Employees who engage in such activity will be immediately dismissed from service." (Id. at 187.)

To Hargett's charge that other employees had been accused of sending pornographic and inappropriate e-mails but were not terminated, Hyland stated that Hargett's accusation "presumably relates to a wide ranging investigation that was concluded in early 2000 that revealed that a number of employees had transmitted inappropriate e-mails and attachments to other employees, including subordinates." (Id.) Hyland explained that those employees were penalized with a thirty-day suspension and final warning, rather than firing because, until the August 2000 letter referenced above, NYCTA had not published clear guidelines on the use of the NYCTA e-mail system. (Id.)

30

Hyland stated he was aware of "no case at [NYCTA] in which an employee was found to have made materially false statements in an employment action without being dismissed from service." (Id.)

Hyland also noted that he had considered Hargett's claim that NYCTA was taking action against him because of his involvement in COMTO. After a review of the documentation of the 2003 incident, discussed *supra*, in which Hargett had been issued a re-instruction by Ross after failing to follow his instructions for the preparation of written materials involving a NYCTA-sponsored event, Hyland concluded that there was no link between Hargett's involvement in COMTO and the disciplinary charges against him.

Therefore, Hyland upheld the charges against Hargett and the punishment of dismissal.

Grill, as the Materiel Division Head, approved Hargett's termination from NYCTA. (Pl. Mot. Ex. 1, Grill Dep. Tr. at 24:24-25:8.)

Hargett's Appeal to the MTA

During his appeal, Hargett sent two memoranda, dated July 12 and July 14 of 2004, to the MTA Office of Civil Rights, making the same arguments he made in his internal appeals. (Id. at 30-1.) By letter dated July 17, 2005, a representative of the MTA Office of Civil Rights, Division of Equal Employment Opportunity informed Hargett that after a "careful review of your allegations, we have determined that you have not established a claim of unlawful discrimination or racial discrimination." (Id. at 32.)

After Hargett's termination had been sustained by Hyland, Hargett wrote another letter, dated November 30, 2004, to James Harding, Commissioner of the MTA Board of Directors, asking him to "investigate and to stop the unfair treatment regarding the gross

misconduct charges." (Pls. Mot. at Ex. G.) In that letter, Hargett claimed that Krakauer
was "not an impartial body" because he failed to discipline Gillespie after Hargett filed
an "assault charge" against him. (Id.) He also claimed that management was acting out
against him because he had previously reported disparate treatment to the MTA office of
Civil Rights and the Department of Labor Relations, and because Ross resented his
involvement in COMTO. (Id.) Hargett reiterated his argument that other employees had
not been punished as severely as he was for committing infractions.

　　　Harding testified that he did not remember seeing Hargett's November 30, 2004,
letter, but that if he had received such an allegation he would "forward it to the
appropriate people." (Pl. Mot. Ex. 4, Harding Dep. Tr. at 6:20-11:16.)

## Powell's November 19, 2004 Letter

　　　In late December 2004, defendant Grill received a letter signed by Powell, dated
November 19, 2004, and post-marked December 17, 2004 (Pl. Mot. Ex. X), claiming that
McIntosh "encouraged [her] to build a filed on David [Hargett]" and that she was made
to "sign a statement against [her] will that I received these e-mails from David. . . .David
never sent me any inappropriate e-mails." (Pl. Mot Ex. J.) Powell's letter stated, "David
has always been professional and respectful to me during the time we worked together."
(Id.) She also claimed NYCTA management tried to pressure her to say that Hargett
sexually harassed her and that she saw him push the send button on the e-mails. (Id.)

　　　The NYCTA "Office of Employee Policy Compliance Administrative
Investigations Group" ("NYCTA Investigations") conducted an investigation following
the receipt of Powell's letter. (Pl. Mot. Ex. X.) NYCTA Investigations sent Powell a
letter dated December 23, 2004, requesting that Powell schedule a meeting with the

NYCTA Office of Employee Policy. (Id.) Powell refused to do so, and her refusal was
documented by a letter from NYCTA Investigations dated December 30, 2004. NYCTA
Investigations did interview Powell by telephone and also interviewed NYCTA
employees McIntosh, Harrigan, Newberry, Mesnard, and Ross. Following the
investigation, NYCTA Investigations concluded that, "Powell's allegation that McIntosh
and Mesnard forced her to sign a document with false statements is unsubstantiated."
(Id.) In particular, NYCTA Investigations noted that Powell herself had called the e-
mails inappropriate in her e-mails to Hargett and McIntosh, dated May 26, 2004. The
report also noted that during the phone interview that Powell participated in, she retracted
her statement Hargett had never sent her the inappropriate e-mails. Instead she claimed
that he had sent her the e-mails, but that she did not find them inappropriate. (Id.)
NYCTA Investigations report also reflects that Powell confirmed during the phone
interview that she had provided print-outs of e-mails she received from Hargett to
McIntosh. (Id.)

Unemployment Insurance Appeal Board

Hargett appealed the Department of Labor's initial determination that he was
disqualified from receiving unemployment benefits because he lost his employment due
to misconduct to the Unemployment Insurance Appeal Board. (See Pls. Mot. Ex. T.) At
the appeal hearing, Hargett appeared and told his side of the story—i.e. that he divulged
his full employment history in 1998, and that he did not send inappropriate emails. (Id.)
NYCTA did not appear. (Id.) The Administrative Law Judge (ALJ) found that because
Hargett's denial of NYCTA's charges against him is unrebutted, the record did not

33

support a determination that he lost his employment through misconduct, and allowed Hargett to receive benefits. (Id.)

Plaintiff's Current Employment

Based on records from Hargett's current employer, Consolidated Edison ("Con Ed"), Hargett worked at "Webmasters International" after leaving NYCTA. (Defs. Rule 56.1 Stmt. ¶ 258; Defs. Mot. Ex. II.) During his hiring at Con Ed, Hargett submitted a signed statement in which he represents that he left NYCTA in June 2004 because he was "seeking new opportunities in Connecticut." (Id.)

Administrative Remedies

Hargett filed a Charge of Discrimination with the New York State Division of Human Rights on March 25, 2005. (Defs. Mot. Ex. C.) Hargett checked off "race," "color," "retaliation," and "age" as the bases of the discrimination against him. (Id.) In the written statement accompanying Hargett's charge he claimed that his dismissal was the result of his complaints about disparate treatment, his involvement in COMTO, and his refusal to fire subordinates "as strongly suggested by senior management due to their ages and prior poor performance." (Id.) He claimed again that white NYCTA employees who committed infractions were given punishments commensurate with the one he received. The EEOC issued a determination that it was "unable to conclude that the information obtained establishes violations of the statutes," and Hargett received his right to sue letter on June 21, 2006. (Id.)

34

*DISCUSSION*

## I.    Standard of Review

A party is entitled to summary judgment when there is no "genuine issue of
material fact" and the undisputed facts warrant judgment for the moving party as a matter
of law. Fed. R. Civ. P. 56 (c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In
addressing a motion for summary judgment, "the court must view the evidence in the
light most favorable to the party against whom summary judgment is sought and must
draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith
Radio Corp., 475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for
the Court to determine.  Balderman v. United States Veterans Admin., 870 F. 2d 57, 60
(2d Cir. 1989).  The moving party has the initial burden of demonstrating the absence of a
disputed issue of material fact.  Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Once such
a showing has been made, the non-moving party must present "specific facts showing
that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The party opposing
summary judgment "may not rely on conclusory allegations or unsubstantiated
speculation."  Scotto v. Almenas, 143 F. 3d 105, 114 (2d Cir. 1998).  Moreover, not
every disputed factual issue is material in light of the substantive law that governs the
case.  "Only disputes over facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary judgment."  Anderson, 477
U.S. at 248.  Finally, the nonmoving party "must do more than simply show that there is
some metaphysical doubt as to the material facts."  Matsushita Elec. Industries Co., 475

U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

Because Hargett is proceeding *pro se*, I must judge his pleadings by a more lenient standard than that of the "formal pleadings drafter by lawyers." Haines, 404 U.S. at 520. The Second Circuit has held that courts should "read [pro se litigant's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Hargett's *pro se* status does not, however, excuse him from meeting the requirements of summary judgment. A "pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (internal citations and quotation marks omitted). The accommodations made for *pro se* litigations in their pleadings are "not without limits, and all normal rules of pleadings are not absolutely suspended." Jones v. Dep't of Housing Pres. and Dev., 06-2085, 2007 WL 582751, at * 1 (S.D.N.Y. Feb. 22, 2007) (citing Stinson v. Sheriff's Dep't, 499 F. Supp. 259, 262 (S.D.N.Y. 1980)). This is especially true in this case. Hargett has already asserted essentially identical claims in two prior federal lawsuits against former employers. In one of those suits he was represented; in the other he was *pro se*.

## II.   Hargett's Claim of Race Discrimination[3]

### A. Municipal Liability under § 1981

Hargett claims that he was discriminated against because of his race in violation

of 42 U.S.C. § 1981. Section 1981 provides,

> All persons within the jurisdiction of the United States shall have
> the same right in every State and Territory to make and enforce
> contracts, to sue, be parties, give evidence, and to the full and
> equal benefit of all laws and proceedings for the security of
> persons and property as is enjoyed by white citizens, and shall be
> subject to like punishment, pains, penalties, taxes, licenses, and
> exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Section 1981 "outlaws discrimination with respect to the enjoyment

of benefits, privileges, terms, and conditions of a contractual relationship, such as

employment." Patterson v. County of Oneida, N.Y., 375 F.3d 206, 224 (2d Cir. 2004)

(citing Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 68-69 (2d Cir. 2000).

Hargett has brought his claim of discrimination under § 1981 against NYCTA, a

municipal entity, and three individual employees—Grill, Ross and McIntosh.

A municipal entity and its employees acting in their official capacity may be

held liable under § 1981. Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735-36 (1989);

see also Everson v. N.Y. City Transit Auth., No. 02-1121, 2007 WL 539159, at *33

(E.D.N.Y. Feb. 16, 2007).  However, a § 1981 plaintiff suing a municipal entity must

"prove that the violation was committed pursuant to a 'policy, statement, ordinance,

---

[3] In papers submitted in connection with this motion Hargett asserts for the first time
claims under Title VII and the New York City Human Rights Law (NYC Admin. Code
§8-107.)  However, Hargett never asserted such claims in his complaint in this Court.
Therefore they will not be considered.  The Court notes, however, that Hargett's NYHRL
§ 296 claims will be judged under the same "burden-shifting" analysis used for Title VII
claims, so the result under Title VII and the NYHRL would be the same.  The Court
declines to allow Hargett at this late date to assert claims under the New York City
Human Rights Law.

regulation, or decision officially adopted and promulgated by that body's officer.'"

Bazile v. N.Y. City Hous. Auth., No. 00-7215, 2002 WL 171690, at * 16 (S.D.N.Y. Feb.

1, 2002) (quoting Monell v. Dep't of Soc. Svcs., 436 U.S. 658, 690, (1978)); see also

Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir.1995)

There is no § 1981 liability against a municipality on a theory of *respondeat*

*superior*.  Monell, 436 U.S. at 691 ("a municipality cannot be held liable solely because it

employs a tortfeasor"); Jett, 491 U.S. at 738.  Rather, it must be shown that the official

action was taken pursuant to a policy of the municipality.  "Absent a showing of a causal

link between an official policy or custom and the plaintiffs' injury, [Jett] prohibits a

finding of liability against the [municipal entity]."  Batista v. Rodriguez, 702 F.2d 393,

397 (2d Cir. 1983).

A plaintiff need not identify an articulated rule or regulation to demonstrate a

municipal policy or custom.  Patterson, 375 F.3d at 226.  Proving that an employee with

final decision-making authority engaged in racial discrimination will suffice to establish a

municipal policy or custom.  Everson, 2007 WL 539159, at *34 (citing Pembaur v. City

of Cincinnati, 475 U.S. 469, 483, (1986)).  The question of whether a particular official

has "final decision-making authority" is determined by state law.  Id.; see also McMillian

v. Monroe County, 520 U.S. 781, 786, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)

("understanding of the actual function of a governmental official, in a particular area, will

necessarily be dependent on the definition of the official's functions under relevant state

law").  "[T]he challenged action must have been taken pursuant to a policy adopted by

the official responsible under state law for making policy in that area of the [municipal

entity's] business."  Everson, 2007 WL 539159, at *34  (citing Pembaur, 475 at  482-83.)

However, "The fact that a particular official--even a policymaking official--has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." Pembaur, 475 U.S. at 481-82 (internal citations omitted); see also Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000) ("It does not suffice for these purposes that the official has been granted discretion in the performance of his duties.") Where an official has discretion to hire and fire employees, but does not have the authority to set municipal employment policy, the official's decisions will not subject the municipality to § 1981 liability. Pembaur, 475 U.S. at 484, n.12.

In this Circuit, the plaintiff—even a *pro se* plaintiff—bears the burden of establishing as a matter of law that the conduct of a given official represents official policy. Everson, 2007 WL 539159, at *34 (citing Jeffes, 208 F.3d at 57-58).

Hargett does not identify any official NYCTA policy that discriminates against employees on the basis of race. Hargett has also offered no evidence that Ross, McIntosh or Grill were final decision-makers with respect to employment *policy* at NYCTA. Indeed, the record reflects that the decision to terminate Hargett went through multiple levels of review before it was finalized. McIntosh's initial disciplinary memorandum suggesting Hargett be terminated, which was approved of by Grill, was reviewable by the Step I and Step II officers. Ross's decision as the Step I officer was reviewable by the Step II officer. Hyland—who is not a named defendant—issued the final decision to terminate Hargett for his infractions, and there is no evidence in the record that he even possessed final decision-making authority with respect to NYCTA

employment policy. Grill, as Vice President of Materiel, approved Hargett's final termination, and attests in his affidavit that he is responsible for Material Division personnel decisions. (Grill Aff. ¶ 8.) Hargett has failed, however, to produce any evidence that Grill, as a Vice President, has authority to institute employment policy decisions at NYCTA. Indeed, in his affidavit, Grill attests he answers to the Executive Vice President of NYCA, a fact which weighs against a finding that Grill possessed employment policy making authority for NYCTA. (Grill Aff. ¶ 7.) The lone fact that Grill had power over approval over termination decisions in the Materiel Division is an insufficient premise for municipal liability. See Pembaur, 475 U.S. at 484, n.12.

Moreover, even if Hargett could show that Grill—or any of the individuals involved in the decision to fire him—possessed the requisite authority to subject NYCTA to municipal liability, (as will be discussed in greater detail in the next section) Hargett has failed to raise a triable issue of fact on whether the decision to fire him was casually connected to his race. "[N]aked assertions by a plaintiff that race was a motivating factor-without a fact specific allegation of a causal link between a defendant's conduct and the plaintiff's race-are too conclusory to allege a § 1981 violation." Bazile, 2002 WL 171690, at *15 (internal quotations omitted).

Hargett has failed to meet his burden to raise a triable issue of fact on the issue of § 1981 discrimination under Jett.

NYCTA's motion for summary judgment on Hargett's claim of discrimination under § 1981 is granted.

40

**B.    Liability of the Individual Defendants under § 1981 and Liability of NYCTA and the Individual Defendants under NYHRL § 296**

Though Hargett has failed to meet his burden to present evidence from which a jury could find Grill, Ross and McIntosh liable under § 1981 in their official capacity, the Court must determine whether Hargett has raised a triable issue of fact on the personal liability of the individual defendants under § 1981.

Under § 1981, personal liability of a defendant may not be predicated solely on a position of seniority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.1996). It must be shown that the defendant had personal involvement in the allegedly discriminatory conduct in order for personal liability to attach. See, e.g., Bazile, 2002 WL 171690, at * 16.

There is no dispute that all three individual defendants were personally involved in the decision to fire Hargett.

The standard for individual liability under § 1981 is the same as that under Title VII. See, e.g., Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 617 (1999). Hence, Courts utilize the Title VII "burden-shifting" framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 (1973) for claims brought under § 1981. Id.; see also, e.g., Anderson v. Hertz Corp., 303 Fed. Appx. 946, 947 (2d Cir. 2008); Hargett v. Nat's Westminster Bank, U.S.A., 78 F.3d 836, 838 (2d Cir. 1996).

Hargett also asserts a state law claim under NYHRL for wrongful termination on the basis of racial discrimination against the NYCTA Defendants. N.Y. Exec. Law § 296 (McKinney 2008) (West 2009). Section 296 makes it an unlawful discriminatory practice,

41

> For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

The standard for a plaintiff bringing a claim under § 296 of the NYHRL is also identical to Title VII. See, e.g., Miller Brewing Co. v. State Div. of Human Rights, 66 N.Y.2d 937, 938-939 (1985); Leopold v. Baccarat, Inc., 174 F.3d 261, 264 n. 1 (2d Cir. 1999); Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000).

Since the Title VII burden-shifting frame work is applies to both Hargett's claim under NYHRL § 296 and his claim under § 1981 against Grill, Ross, and McIntosh in their personal capacity, the Court will consider these claims together.

### 1.    The McDonnell Douglas Framework

Under the familiar three-step test, the plaintiff bears the initial burden proving, by the preponderance of the evidence, every element of a *prima facie* case of discrimination. McDonnell Douglas, 411 U.S. at 802; McMillan v. Examination Mgmt. Servs., Inc., No. 94-2229, 1996 WL 551725 at * 7 (S.D.N.Y. Sept. 27, 1996). To make out a *prima facie* case of discrimination, the plaintiff must introduce evidence that would, if credited, establish that: "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Feingold v. N.Y., 366 F.3d 138, 152 (2d Cir. 2004) (citing Collins v. N.Y. City Transit Auth., 305 F.3d 113, 118 (2d Cir.2002)); Mario v. P&C

Food Mkts., Inc., 313 F.3d 758, 767 (2d Cir. 2002) (citing Farias v. Instructional Sys.,
Inc., 259 F.3d 91, 98 (2d Cir. 2001)).

If the plaintiff meets that minimal burden, the burden of production shifts to the
defendant, who must come forward with a legitimate non-discriminatory reason for
taking the action it took. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55
(1981). ) "The defendant's burden of production also is not a demanding one; [he] need
only offer such an explanation for the employment decision." Bickerstaff v. Vassar
College, 196 F.3d 435, 446 (2d Cir. 1999

At that point, the burden shifts back to the plaintiff to prove, with evidence, not
conclusory supposition, that the defendant's articulated rationale is a pretext for
discrimination. McDonnell Douglas, 411 U.S. at 804. However, "a reason cannot be
proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false,
*and* that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S.
502, 515 (1993) (internal citation omitted) (emphasis in original). "The ultimate burden
of persuading the trier of fact that the defendant intentionally discriminated against the
plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253 (citing Bd. of
Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, 25, n.2 (1978).

The Court will assume that Hargett has made out a *prima facie* case and that
defendants have articulated a legitimate non-discriminatory reason—namely, that Hargett
sent inappropriate e-mails and falsified employment documents—for taking disciplinary
action against Hargett.

Going straight the pretext stage of the analysis, the Court must answer the
question of whether Hargett has raised a triable issue of fact on the "ultimate issue" of

43

whether his dismissal was motivated by his race.  Shafrir v. Assoc. of Reform Zionists of Am., 998 F. Supp. 355, 360 (S.D.N.Y. 1998).  He has not.

"If an employer articulates a nondiscriminatory reason for its conduct, the inference of discrimination raised by plaintiff's prima facie case 'simply drops out of the picture' and the burden shifts back to the plaintiff to prove that the employer's nondiscriminatory explanation is pretextual." Morris v. Ales Group USA, Inc., No.04-8239, 2007 WL 1893729, at *6 (S.D.N.Y. June 29, 2007) (quoting St. Mary's Honor Ctr., 509 U.S. at 511).  In order to defeat a motion for summary judgment, a plaintiff at this stage "must submit admissible evidence showing circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Lanier v. I.B.M. Corp., 319 F. Supp. 2d 374, 381 (S.D.N.Y. 2004).  Specifically, plaintiff must raise a material issue of fact as to whether (1) defendant's asserted reason for adverse action is false or unworthy of belief and (2) more likely than not the plaintiff's race was the real reason.

### a.   The Inappropriate E-mails

On the charge of sending inappropriate e-mails, Hargett claims that the e-mails "could" have been a result of a virus or someone who hacked onto his computer and sent the e-mails from his account, and therefore he should not have been fired.  Hargett misapprehends the relevant inquiry.  The question is not whether Hargett actually sent the e-mails; it is whether NYCTA "honestly believe[d] in the reasons it offers." Bucknell, 82 F. Supp. 2d at 157 (quoting Fischbach v. Dist. of Columbia Dept. of Corrs., 86 F.3d 1180, 1183 (D.C.Cir.1996)).  Even if the NYCTA Defendants were wrong, and it turned out that e-mails were sent by a rogue NYCTA employee who hacked into Hargett's e-

mail account, or the result of a stealth computer virus (none of which, by the way, is at all credible or suggested by evidence, rather than conjecture) it does not matter. All that matters is whether the NYCTA Defendants had a good faith belief in the non-discriminatory, legitimate business reason it offers.

There is no evidence in the record to suggest that the NYCTA Defendants did not honestly believe that Hargett sent the inappropriate e-mails. Indeed, the record reflects that the NYCTA Defendants received information—both from Powell and from an investigation of his computer hard drive—that Hargett had sent non-work related e-mails of a questionable nature from his NYCTA account. The NYCTA Defendants corroborated this evidence by showing print-outs of the e-mails to three of Hargett's subordinates who were listed as recipients, and that they all confirmed receiving such e-mails or ones like it from Hargett. There is also evidence that NYCTA confirmed with the NYCTA technology department that the e-mails had indeed been pulled from Hargett's hard drive, and not from someone else's, as he claimed.

The November 2004 letter from Powell that contradicts some of Powell's earlier statements about the e-mails does not alter the analysis. After receiving the letter, NYCTA investigated Powell's claim and made a determination that the statements in Powell's letter were not credible, and that other evidence—including Powell's own statements in a telephone interview—corroborated the charge of sending inappropriate e-mails against Hargett.. There is no evidence that NYCTA did not make that determination in good faith and with an honest belief that Hargett sent the inappropriate e-mails—especially since Powell retracted her assertion that Hargett did not send her the e-mails.

But even if all of the allegations in Powell's letter are true, there is no suggestion in the record that the NYCTA Defendants were acting against Hargett *because of his race.* It is clear that in the spring of 2004, and even before that, there was hostility between Hargett and other employees in the Materiel Division, and indications that Hargett was not well-liked by his superiors. But no where is there any evidence that the hostility had anything to do with the fact that Hargett is black. Hargett in essence argues (1) I am black; (2) I was fired; (3) Therefore, I was fired because I am black. Such reasoning is no substitute for evidence of racial animus, of which there is none in the record.

Hargett argues that the NYCTA Defendants were conspiring to get him fired. He notes that Germaine Harrigan (a/k/a Germaine Jerome) testified at her deposition that she felt pressure to sign the statement that Hargett sent her the inappropriate e-mails showed to her by Mesnard because of the NYCTA policy against sending inappropriate materials. (Pl. Ex. 8, Jerome Dep. Tr. at 7:13-8:14.) But Harrigan never testified that she did not receive the e-mails from Hargett; indeed, she testified that she specifically remembered receiving the Janet Jackson e-mail. (Id. at 9:3-4.) That is really all that matters.

Further, Hargett does not explain how the circumstances surrounding the NYCTA Defendants' obtaining these statements from the three woman Powell supervised shows that racial discrimination was behind the charges against him.

Hargett also argues that discrimination was at play because employees, who are not black, were not fired after they were caught sending off-color or pornographic e-mails. In his Step II appeal decision, however, Hyland explained that the employees who sent pornographic e-mails sometime in 2000 were not fired because at that time the

46

NYCTA e-mail policy had not been fully established and publicized within NYCTA. When Hargett, however, sent inappropriate e-mails in 2003 and 2004 after a policy clearly prohibiting such conduct had been published., with dismissal as the indicated penalty. There is no evidence in the record to suggest that this explanation is not the real reason for the discrepancy in punishment.

Moreover, Krakauer clearly stated during the appeals process that the e-mails alone would not likely have resulted in termination (despite the NYCTA's President's August 2000 letter setting dismissal as the presumptive immediate penalty). At his deposition, Grill confirmed that Hargett was fired not because of the inappropriate e-mails, but because NYCTA determined that he had submitted fraudulent documents at the time of his hiring. (Pl. Mot. Ex. 1, Grill Dep.Tr. at 42:2-15.) Hargett could not identify any employee, of any race, who had been charged with both sending inappropriate e-mails and falsifying documents, and who was not fired. (See Defs. Mot. Ex. GG, Hargett Dep. Tr. at 197:21-201:10.)

### b.    The Falsification of Employment Documents

Hargett essentially makes three arguments about the statements he made during his 1998 hiring. None is persuasive.

First, Hargett argues that the NYCTA Defendants had no right to research his background, and that doing so was an invasion of his privacy. This is patently ridiculous. Hargett's lawsuits against NatWest and Summit are *public information*. When Hargett filed his complaints in those actions, he made his employment history at NatWest and Summit public, and the NYCTA Defendants had every right to access those publicly filed court documents.

47

Hargett makes much of the fact that NYCTA did not produce the document found on his computer that prompted the Defendants to do the legal research that led to information about his two complaints. But it does not matter what tipped NYCTA off, because the documents found by the legal department on LexisNexis or some other legal search engine are public, and Hargett cannot claim a privacy interest in them.

Moreover, there is not a bit of evidence that the search into Hargett's employment history was motivated by racial animus. Indeed the record indicates that NYCTA's investigation was prompted by its receipt of inappropriate e-mails sent from Hargett's account, not by Hargett's race.

Second, Hargett claims that it was unfair for the NYCTA Defendants to research his employment background because he passed a background check in 1998 and had already worked at NYCTA for over five years. In essence Hargett's argument is that since the NYCTA Defendants failed to that he lied to them in 1998, they missed their chance. But there is no such rule. It was only good luck—and perhaps shoddy work by the human resources department—that NYCTA did not discover that Hargett had been twice fired, and was lying on his employment application.

Hargett points out that Gillespie—a white employee—was not subject a random background and credit check after the 2001 altercation. To begin with, Krakauer specifically stated in his Step I decision that no credit check had been performed on Hargett during the investigation in 2004. (See Defs. Mot. Ex. BB at 108.) Moreover, the fact that Gillespie's employment background was not investigated is not relevant, because there is no indication that NYCTA had reason to believe that Gillespie lied the

circumstances of his prior job on his employment application. Gillespie's situation is thus not comparable to Hargett's.

The employees who were accused of illegally accepting gifts from vendors are also not suitably comparable to Hargett. Grill testified at his deposition that NYCTA investigated that charges against the individuals and found them to be unsubstantiated (Pl. Mot. Ex. 1, Grill Dep. Tr. at 18:16-19:3.) Plaintiff admits that these employees were "accused" of an infraction, not found guilty. By contrast, Hargett was found to have provided false information on his hiring forms.

If there were evidence that NYCTA received information that a white employee had falsified documents or lied on an employment application, and did not investigate the charge, then that evidence could raise a triable issue of fact about whether discriminatory animus underlay NYCTA's actions. But there is no such evidence. The fact is that NYCTA became privy to the fact that Hargett had been terminated by two employers—a fact Hargett does not deny—and there is nothing to suggest that NYCTA either sought out or used this information because of racial bias.

At his deposition, Hargett offered only his assertion that similarly situated white employees were treated differently as the evidence of disparate treatment.

Q: Do you have any reason to believe that Ross, Grill, or McIntosh, when they prepared those charges, were motivated by the color of your skin?

A: Yes.

Q: What evidence do you have?

A: I don't have evidence right now. But again, similarly situated white employees were treated different.

...

49

Q: With respect to Krakauer's step one decision and Hyland's step two decision, do you have any reason to believe that they wrote those decisions and came to those conclusions because of the color of your skin?

A: I don't know.

(Defs. Mot. Ex. GG, Hargett Dep. Tr. at 198:9-17; 198:21-199:3.)  When asked which white employees were treated differently, Hargett cited the employees who were accused of accepting gifts, the employees who were found to have sent inappropriate e-mails, and Gillespie. (Id. at 199:11-201:10.)  As discussed above, Hargett has not shown that these employees were similarly situated to him to give raise to a triable fact on the issue of discrimination.

Third, Hargett argues that he told NYCTA Human Resources representative Bar-David about his lawsuits, and that Bar-David instructed him to not to disclose his terminations and to put "Bank Merger" as his reason for leaving his prior employers. He also claims that he provided human resources with a revised Pre-Employment Application on August 11, 1998 in which he changed his answer to question ten to "no." Hargett also states that he provided NYCTA with numerous references in 1998, and that NYCTA could have found out about his terminations and lawsuits from those references. Reading Hargett's papers to make the most cogent argument they suggest, Hargett's claim is that NYCTA learned of his firings in 1998 but only chose to make an issue out of them in 2004 because of his race. The record, however, does not support this argument.

To begin with, all of the documents from Hargett's employment application in Hargett's NYCTA personnel file reflect that Hargett answered questions about whether he had been terminated in the negative, and gave "bank merger" as Hargett's reason for leaving NatWest and Summit. Even on the copy of the Pre-Employment Application that

Hargett produced during his internal appeals, "bank merger" is still listed as his reason for leaving his prior employers. There is no evidence—other than Hargett's own assertion—that Bar-David, the NYCTA Human Resources Department, or anyone at NYCTA at all was told by Hargett about his previous terminations.

Hargett did indeed provide NYCTA with several references, but he offers no evidence that provides any information—or even knew about—the circumstances in which Hargett left NatWest and Summit.

No rational juror could conclude from this evidence that NYCTA knew the truth about Hargett's employment history in 1998, and chose to act on such information in 2004 because of racial bias.

###### c. Hargett's Other Claims

As to Hargett's charge that he was discriminated against because of his involvement with COMTO—which will be discussed further in the next section—Hargett offers no evidence, other than his own conclusory accusations that Hargett's involvement with a minority organization had anything to do with his termination.

Hargett's claim—asserted for the first time, as far as the Court knows, in Hargett's opposition memorandum—that Ross made a comment that Hargett was not "one of his boys," is not supported by anything in the record. Further, as discussed above, when asked at his deposition about what evidence Hargett had of racial bias in his termination decision, Hargett could not come up with any specifics, other than his general allegation that white employees were treated differently (which, discussed above, does not raise an inference of race discrimination).

Hargett points out that the ALJ in his unemployment hearing found his evidence

to be credible and awarded him unemployment benefits. NYCTA, however, did not

appear at that hearing, and there is evidence is that the ALJ heard only Hargett's

unrebutted version of events. In light of the record before this Court, the ALJ's decision

raises no triable fact on the issue of discrimination.[4]

Because Hargett failed to meet his burden of raising a material issue of fact

concerning whether the NYCTA Defendants' stated reasons for firing him were a mere

pretext for discrimination, summary judgment is granted in favor of NYCTA on

Hargett's claim that NYCTA practiced illegal discrimination in violation NYHRL § 296

in terminating him. Hargett's claim against the individual defendants in their personal

capacity under § 1981 must also be dismissed for the same reason.

### 2.    Retaliation under § 1981

While not specifically articulating this claim in his complaint, Hargett also

appears to be arguing that his termination was in retaliation for his involvement with

COMTO. He argues after the incident in May of 2003 when Ross and Hargett disagreed

about COMTO's participation in the NYCTA conference for minority contractors, Ross

was out to fire Hargett. (Pls. Opp'n. at 5.) In an October 27, 2003 memorandum to

McIntosh regarding the Safety Show contract, Hargett claimed that he felt resentment

from upper management because of his participation in COMTO.

---

[4] A NYCTA representative, Cassandra Eva Havens, wrote a letter to the New York
Unemployment Board on November 10, 2004, stating that NYCTA would not be
participating in the unemployment hearing, and stated that there was an arbitration
pending. (Pl. Ex. S.) Hargett argues that he was never a party to an arbitration, and
should have been allowed to participate. There is no evidence, other than Havens's letter,
that any arbitration was ever held. The evidence is that Hargett had the opportunity to
pursue the NYCTA internal appeals process in accordance with NYCTA policy. (See Pl.
Ex. Y.) Thus, no triable fact is raised by Havens's letter.

The Supreme Court recently held claims of retaliation are cognizable under §

1981. CBOCS West, Inc. v. Humphries, 128 S.Ct. 1951, 1955 (2008).

To make out a case of retaliation, a plaintiff must show (1) he was engaged in a

protected activity; (2) his employer was aware of that activity; (3) he suffered a

materially adverse action; and (4) there was a causal connection between the protected

activity and the adverse employment action. Antonmarchi v. Consol. Edison Co. of N.Y.,

Inc., 03-7735, 2008 WL 4444609, at *8 (S.D.N.Y. Sep 29, 2008);  See also Burlington

Northern & S.F. Ry. v. White, 548 U.S. 53, 68-69 (2006) (citations and quotations

omitted); Pugni v. Reader's Digest Ass'n, Inc., No. 05-8026, 2007 WL 1087183 at *22

(S.D.N.Y. Apr. 9, 2007).  If the plaintiff meets this burden, the McDonnell-Douglas

burden-shifting analysis applies. Bush, 452 F. Supp. 2d at 415. (citing Terry v. Ashcroft,

336 F.3d 128, 141 (2d Cir. 2003)).

Reading the record in the light most favorable to Hargett, the Court finds that

Hargett's complaints to management about being treated poorly because of his

involvement in COMTO are a protected activity.  See Cruz, 202 F.3d at 566 ("The term

'protected activity' refers to action taken to protest or oppose statutorily prohibited

discrimination.")  Therefore, since it is clear that management knew of Hargett's

complaints, and since Hargett suffered a materially adverse employment action when he

was fired from NYCTA, Hargett meets the first three prongs of a retaliation claim.

However, Hargett has presented no evidence to show a causal connection between

his complaints that he felt resentment from management because of his involvement in

COMTO, and his termination.  At his deposition Ross categorically denied any

resentment over Hargett's participation in COMTO, testifying

> If you are trying to suggest that I wrote this memo to Mr. Hargett
> because I was outraged at your participation in this organization
> [COMTO], absolutely not, the reinstruction was for what it was, it
> was a reinstruction because I gave specific instructions to a
> managerial employee, David Hargett, and those instructions were
> not followed . . .

(Ross Dep. Tr. at 38:5-11.) No rational juror could conclude from the evidence

surrounding the 2003 COMTO incident that Hargett's firing—or the investigation into

Hargett's e-mail and employment history—was in retaliation for Hargett's complaints

about COMTO.

Nor can plaintiff indirectly establish causation through circumstantial evidence

"showing that the protected activity was closely followed in time by the adverse

[employment] action." Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d

Cir.1996). While the Second Circuit has articulated no "bright line" rule of when an

allegedly retaliatory action occurs too far in time from the exercise of a federal right to be

considered causally connected, Gorman-Bakos v. Cornell Co-op Extension of

Schedectady Cty., 252 F.3d 545, 554 (2d Cir. 2001), it is well settled that there when

"mere temporal proximity" is offered to demonstrate causation the protected activity and

the adverse action must occur "very close" together. Clark Cty. Sch. Dist. V. Breeden,

532 U.S. 268, 273-74 (2001)(internal quotation omitted). Time periods greater than one

year are generally conclusive that a causal nexus has *not* been established. See, e.g.,

Deravin v. Kerik, No. 00 Civ. 7487, 2007 WL 1029895, at *11 (S.D.N.Y. Apr. 2, 2007);

Zenni v. Hard Rock Cafe Int'l, Inc.(N.Y.), 903 F. Supp. 644, 656 (S.D.N.Y. 1995).

Further, time periods as short as three months have been found to be too long to give rise

to an inference that the subsequent action was retaliatory. Breeden, 532 U.S. at 273-74

(citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997)); see also

Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990). One court in this Circuit has observed that "two months between the protected activity and the adverse employment action seems to be the dividing line." Wright v. N.Y. City Off Track Betting Corp., No. 05-9790, 2008 WL 762196, at *5 (S.D.N.Y. Mar. 24, 2008).

The disagreement over the conference of minority transportation contractors occurred thirteen months before Hargett was fired, and his mention of the incident in his memorandum to McIntosh occurred eight months before Hargett was fired. Without more, this is not enough to raise a material issue of fact that Hargett's termination casually connected to Hargett's complaints *vis a vis* his involvement in COMTO—especially given the fact that the inappropriate e-mails and the application lies came to light in the intervening months between the protected activity and Hargett's termination.

Moreover, even there was sufficient evidence to conclude that friction over COMTO was casually connected to Hargett's termination, as discussed *supra*, Hargett has failed to show that the reasons NYCTA provided for firing Hargett were pretext for discrimination under the McDonnell Douglas test.

Therefore, summary judgment is granted in favor of NYCTA on Hargett's claim of retaliation under § 1981. Hargett's motion for summary judgment on retaliation is denied.

## III.    Hargett's ADEA Claim

The ADEA bars an employer from discharging an employee because of age. See, e.g., Haskell v. Kaman Corp., 743 F.2d 113, 119 (2d Cir. 1984) (citing 29 U.S.C. § 623(a)). ADEA claims are analyzed under the McDonnell Douglas "burden-shifting" frame work. See, e.g., Fisher v. Vassar Coll., 70 F.3d 1420, 1449 (2d Cir. 1995). To

make out a *prima facie* case of age discrimination, a plaintiff must show (1) membership in a protected age group; (2) qualification for the position; (3) an adverse employment decision; and (4) circumstances giving rise to an inference of discrimination. Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 96-97 (2d Cir. 1999).

Hargett alleges in his complaint that his termination also violated the ADEA, 29 U.S.C. § 621, *et seq*. (06 cv 7095 Compl. ¶¶ 29-30.) But plaintiff alleges *no* facts whatsoever about how he was discriminated against because of his age. Indeed, plaintiff does not even indicate in his age in his complaint. In papers submitted with this motion, plaintiff refers to himself as "over the age of 40." He argues in his motion papers that NYCTA tried to get him to fire subordinates—Elias McDuffie, Dennis Vengel, Linda Travis and Jocelyn Powell—who were also over 40.

Assuming that Hargett has shown membership in a protected age group, he still has not made out a *prima facie* case of age discrimination because his evidence of circumstances giving rise to an inference of discrimination is non-existent. Hargett claims that older employees were transferred to him so that Hargett could fire them. (Pl. Opp'n at 4.) But Hargett provides no evidence—other than his own speculation—that NYCTA sought to terminate those employees because of their age. "The [summary judgment] motion will not be defeated merely . . . on the basis of conjecture or surmise." Goenaga, 51 F.3d at 18 (quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991); see also Bush v. Fordham Univ., 452 F. Supp. 2d 394, 412 (S.D.N.Y. 2006).

Moreover, in Hargett's complaint as well as his internal appeal memo of July 2, 2004, he alleged that those same four employees were "poor performing (and

56

problematic.)" (Compl. ¶ 10.; Defs. Mot. Ex. BB.) Thus, Hargett himself submits that there were reasons—other than age—that NYCTA would want to terminate these employees.

Hargett has failed to make out a *prima facie* case of age discrimination under the ADEA. Summary judgment is granted in favor of NYCTA, and Hargett's motion for summary judgment is denied.

### *Conclusion*

NYCTA's motion for summary judgment is granted in its entirety. The Clerk of the Court is directed to close both of Hargett's actions (docket numbers 06-cv-7094 and 06-cv-7095).

Dated: August 4, 2009

U.S.D.J.

BY ECF AND AIR MAIL TO ALL PARTIES